THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| **BRANDON SINDELIR,** | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. 3:22-cv-1567** |
| | § | |
| **KEVIN VERNON JR.,** and | § | |
| **JOHN DELEON,** | § | |
| | § | |
| *Defendants.* | § | |

<u>**PLAINTIFF'S ORIGINAL COMPLAINT**</u>

**TO THE HONORABLE UNITED STATES DISTRICT JUDGE:**

COMES NOW, BRANDON SINDELIR, Plaintiff, complaining of KEVIN VERNON JR. and JOHN DELEON, and for causes of action will respectfully show unto the Court as follows:

> For purposes of a legal inquiry into municipal liability under § 1983…[a] plaintiff must demonstrate that a municipal decision reflects deliberate indifference to the risk that a violation of a particular constitutional or statutory right will follow the decision. Only where adequate scrutiny of an applicant's background would lead a reasonable policymaker to conclude that the plainly obvious consequence of the decision to hire the applicant would be the deprivation of a third party's federally protected right can the official's failure to adequately scrutinize the applicant's background constitute "deliberate indifference."

*Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 411, 117 S. Ct. 1382, 1392, 137 L. Ed. 2d 626 (1997).

## SUMMARY

Chief of Police John Deleon hired Officer Kevin Vernon at the Ferris Police Department despite knowledge of Officer Vernon's termination from the Wilmer Police Department after three shocking excessive use of force incidents involving female detainees. Subsequently, on July 19, 2020, Officer Vernon slammed female detainee Plaintiff Brandon Sindelir to the ground in an unprovoked takedown maneuver and twisted her arm behind her. This was an unnecessary and unreasonable amount of force used against Ms. Sindelir which was clearly excessive to the need which was strikingly similar to Officer Vernon's prior use of force incidents against female detainees, which should have prevented Chief Deleon from hiring Officer Vernon in the first place. Officer Vernon also illegally detained Ms. Sindelir, even though Defendant Vernon did not have reasonable suspicion nor probable cause to believe that Ms. Sindelir committed any offense. On July 22, 2020, Defendant Vernon was terminated from the Ferris Police Department following an internal affairs investigation into this incident. Ms. Sindelir now files this lawsuit for violation of her constitutional rights under the Fourth and Fourteenth Amendments to the United States Constitution.

## I.
## PARTIES

1.      Plaintiff Brandon Sindelir is a resident of Ellis County, Texas.

2.      At all times relevant to this suit, Defendant Kevin Vernon was a police officer with the Ferris Police Department and may be served in Ellis County, Texas, or wherever he may be found. Defendant Vernon is being sued in his individual capacity.

3.      At all times relevant to this suit, Defendant John Deleon was the Chief of Police of the Ferris Police Department. Defendant Deleon may be served at his place of employment at the

Ferris Police Department located at 111 Ewing Street Ferris, TX 75125, or wherever he may be found. Defendant Deleon is being sued in his official capacity.

## II.
## JURISDICTION AND VENUE

4.      The Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1331 and § 1343 since Plaintiff is suing for relief under 42 U.S.C. § 1983.

5.      Venue is proper in the Northern District of Texas pursuant to 28 U.S.C. § 1391 because the Defendants are domiciled and/or reside in the Northern District of Texas and all of the causes of action accrued in the Northern District of Texas.

## III.
## FACTS AND ALLEGATIONS

6.      At all times relevant to this lawsuit, Defendant Vernon was acting under the color of law and working as a police officer for the City of Ferris Police Department.

7.      At all times relevant to this lawsuit, Defendant John Deleon was acting under color of law as the Chief of Police for the City of Ferris Police Department.

**Defendant Vernon's History of Excessive Force Against Female Detainees**

8.      Prior to the incident that makes the basis of this lawsuit, Defendant Kevin Vernon while employed with the Wilmer Police Department had a history of using flagrant excessive force and fabricating facts to justify detention against women during traffic stops.

9.      On September 19, 2019, during a traffic stop, Defendant Vernon abruptly and aggressively grabbed a female detainee.

10.      During the traffic stop, Defendant Vernon stated, "Step out of the vehicle please. Step back to my vehicle."

11.     The female detainee was not loud and not making any movements that would indicate she was a potential threat to officer safety as she simply took five steps and stated, "I am going to stand over here."

12.     Once in handcuffs Defendant Vernon grabbed the female detainee by her arm and jerked her in the direction of his patrol vehicle although the female detainee was not resisting.

13.     Defendant Vernon spoke to the female detainee once back in his patrol vehicle in a disrespectful manner by stating, "you probably need to check your attitude, that is what got you in this position."

14.     By stating, "you probably need to check your attitude, that is what got you in this position," Officer Vernon acknowledged the possibility that he physically used force to detain the female detainee simply based on his displeasure with her "attitude" and not because of reasonable suspicion or probable cause to detain her for a suspected offense as Defendant Vernon subsequently released the female detainee.

15.     On October 26, 2019, during a traffic stop, Defendant Vernon forcibly slammed the door on a female detainee's foot.

16.     Officer Higdon decided to give the female detainee a citation and release her after she parked in a handicapped parking spot at a gas station.

17.     Defendant Vernon approached the female detainee as she sat in her vehicle with the door open and her leg out of the door.

18.     Defendant Vernon told the female detainee, "For our safety we are telling you to close your door." The female detainee responded, "Okay, I don't know..." at which point Defendant Vernon forcibly grabbed the door of the vehicle and began closing it before the female detainee had a chance to do so.

19.     As Defendant Vernon closed the door the female detainee's foot became caught in the door.

20.     Once the door made contact with the female detainee's foot and would not close Defendant Vernon quickly repositioned his hand and attempted to force the door shut while the female detainee screamed out in pain, "you are squashing my foot."

21.     Defendant Vernon stated, "well you should have complied," and slammed the door once the female detainees' foot was removed.

22.     The female detainee did nothing more than sit in her vehicle at this point as instructed and still Defendant Vernon attempted to detain and or arrest the female detainee by asking Officer Higdon who had been sitting issuing a citation, "did you say she has warrants out of Wilmer? Okay if you want to go ahead and confirm them."

23.     Defendant Vernon then told Officer Higdon if she [the female detainee] wants to give problems she can just go to jail.

24.     Although, the female detainee was not posing a threat to officer safety, Defendant Vernon forcibly slammed the door on her foot blaming it on her actions and throughout the encounter failed to use any de-escalation techniques.

25.     On November 12, 2019, during a traffic stop, Defendant Vernon forcibly grabbed a female detainee by the hands, slammed her up against his patrol vehicle, and threw her in the back of his patrol unit.

26.     Defendant Vernon approached a vehicle parked in a handicapped parking spot at a store.

27.     Defendant Vernon made contact with the vehicle and asked a passenger to call her mother and tell her to come out of the store to receive a citation.

28.     Defendant Vernon made contact with the passenger's mother and requested she step over to his patrol vehicle.

29.     Defendant Vernon requested the woman's number while she stood toward the front of his patrol vehicle and instructed her to 'hang tight" while he entered his patrol vehicle.

30.     The woman asked, "Can I sit in my car" to which Defendant Vernon replied, "NO, you can stand right there."

31.     In reaction to not being under arrest nor detained, the woman stated, "No sir," to which Defendant Vernon responded by exiting his patrol vehicle and stating, "Okay, you can sit in the back of my car, you can sit in the back of my car."

32.     The woman responded, "I don't need to be in the back of your car," as she was not under arrest nor being detained.

33.     Defendant Vernon reached for her arm/shoulder and told her, "Put your hands behind your back, put your hands behind your back, put your hands behind your back."

34.     The woman exclaimed, "what is your problem, what is your problem," while Defendant Vernon used physical force with his hands and body to turn the woman towards his patrol vehicle.

35.     While attempting to restrain the woman physically, Defendant Vernon moved the female detainee to the rear passenger door of his patrol vehicle where she was placed without handcuffs.

36.     Sergeant Almanza, who responded to the scene, advised Defendant Vernon to take a less aggressive action on the woman.

37.      While speaking with Sergeant Almanza, Defendant Vernon was unable to see the problem with his conduct and defended his actions by stating **that is how he does all of his traffic stops.**

38.      Defendant Vernon's original statement about the traffic stop was not accurate to what body cam footage showed.

39.      During the traffic stop, Defendant Vernon advised Sergeant Almanza that the woman was verbally aggressive and would not comply to his commands.

40.      However, body cam footage showed that the woman was cooperative and complied with Defendant Vernon's instructions and answered his questions.

41.      During an internal affairs investigation into this incident, Officer Vernon falsely fabricated officer safety concerns in his written responses as justification for why he used excessive force.

42.      Officer Vernon stated in his written response that the woman yelled at him, but the audio/video showed she was somewhat agitated but was not yelling.

43.      Shockingly, in Defendant Vernon written report about the traffic stop Vernon stated: "I should have taken further de-escalation measures, other than just removing [the woman] away from the audience. I learned that I need to take more time to evaluate the situation before responding too quickly to certain situations." Below is a screen capture of Defendant Vernon's written response.

> I should have taken further de-escalation measures, other than just removing Vera away from the audience. I learned that I need to take more time to evaluate the situation before responding too quickly to certain situations.

44.    Chief Kemp ultimately found Defendant Vernon violated the Wilmer Police Department Use of Force Policy as well as policies and procedures including the law enforcement code of ethics, failure to maintain satisfactory performance standards, discourteous and irresponsible treatment of the public, incompetent and inefficient performance and dereliction of duty, conduct unbecoming of an officer, and **unnecessary and unreasonable use of force.**

There is sufficient evidence to conclude that Officer Vernon's conduct and actions **sustain** the following allegations:

Allegation #1  Violation of Law Enforcement Code of Ethics **(SUSTAINED)**

Allegation #2  Failing to consistently maintain satisfactory performance standards. **(SUSTAINED)**

Allegation #3  Discourteous and irresponsible treatment of the public. **(SUSTAINED)**

Allegation #4  Incompetent and inefficient performance and dereliction of duty. **(SUSTAINED)**

Allegation #5  Conduct unbecoming of an officer **(SUSTAINED)**

Allegation #6  Unnecessary and unreasonable use of force **(SUSTAINED)**

45.    According to Chief Kemp, he observed negligent, irresponsible and unacceptable conduct and actions by Defendant Vernon that could discredit and harm public trust and confidence in the Wilmer Police Department as well as a **potential for liability situations.**



# Wilmer Police Department
## ===Serving Our Community===
### Chief Victor Kemp

*Learning from the Past...*

*Protecting the Present...*

*Planning the Future...*

## DEPARTMENTAL CORRESPONDENCE

November 21, 2019                                        Control # IA19-001

INVESTIGATION LETTER

### Introduction

On November 12, 2019 for the good of the department Chief Kemp authorized and began conducting the following investigation based on initial concerns that Officer Kevin Vernon may have violated the Wilmer Police Department Use of Force Policy as well as other applicable department policies and procedures while employed as a Police Officer for the City of Wilmer Police Department. After numerous hours of careful and thorough review of evidence Chief Kemp observed negligent, irresponsible and unacceptable conduct and actions by Officer Vernon that could discredit and harm public trust and confidence in the Wilmer Police Department as well as a potential for liability situations.

46.    Defendant Vernon was subsequently terminated from the Wilmer Police Department on December 3, 2019, for the excessive force incident that occurred on November 12, 2019.

## Hiring of Defendant Vernon by Ferris Police Department Despite History of Excessive Force Against Female Detainees

47.    Defendant Vernon repeatedly indicated on his City of Ferris employment application that he had been terminated previously for the use of excessive force while employed as an officer with the Wilmer Police Department.

**SECTION 5: EMPLOYMENT HISTORY**
5.1: EMPLOYMENT INFORMATION

> **INSTRUCTIONS:** Beginning with your present or most recent job, list all employment since the age of 15. Include all part-time, temporary, or seasonal employment regardless of how long you actually worked. List all reserve duty, volunteer work, and internships. Include all periods of unemployment, stating what you were doing and your means of support during this time.

May we contact your current employer?  ☑ Yes  ☐ No
Name of Employer: _Wilmer Police Department_    Begin Date: _11/27/2017_  End Date: _12/05/2019_
(mm/yyyy)    (mm/yyyy)

_219 E Beltline Rd_    _Wilmer_  _TX_  _75172_  _972-441-6565_
Address    City    State  ZIP  Phone #

Name of Supervisor: _Chief Victor Kemp_    Salary: _$50,000 yr_
PD: _972-741-6565_

Name of Coworker: _Sergeant William Jackson_    Phone #: _469-216-0584_

Job Title, Years held in Position: _Police Officer, 2 years_

Description of duties: _Patrol Foot/vehicle, Answering emergency & non-emergency calls,_
_respond to alarms, conduct traffic stops and enforce state, federal and local laws_

Type of Employment:  ☑ Full Time  ☐ Part Time  ☐ Temporary  ☐ Seasonal

Reason for Separation:  ☐ Resigned, w/ notice  ☐ Quit, w/o notice  ☑ Termination
☐ Laid Off  ☐ Temporary, end of term

How much notice was given? _N/A_

Was the amount given in accordance with company policy?    ☐ Yes  ☐ No

Have you received any disciplinary action from this employer?    ☑ Yes  ☐ No
(counseling, memo, verbal or written reprimands, etc.)

If Yes, list date, type of discipline, and explain the circumstances: _12/3/19 was terminated for_
_a "use of force" incident that occurred on 11-12-2019._

7. Have you, regardless of whether the matter is or was appealed, regardless of whether the matter is part of your official record, regardless of whether you believe or think that it might not still be in your file:

   a. Ever been terminated from employment for any reason? ☑ Yes  ☐ No

   b. Ever resigned in lieu of termination (after being told your employer intended to terminate you)?

   ☐ Yes  ☑ No

   c. Ever resigned in lieu of disciplinary action (after being told your employer intended to take disciplinary action against you)? ☐ Yes  ☑ No

   d. Ever quit because you suspected you were going to be terminated or disciplined? ☐ Yes  ☑ No

   e. List all disciplinary action you have EVER received on any job: Terminated from Wilmer PD due to a "use of force" issue in November 2019. I received Counselings and disciplanaries for lateness and policy & procedure violations at Rockwall S.O.

   _____

   _____

   _____

   _____

   ☐ Check this box if you have NEVER been fired or asked to resign from a job.

8. If you have been terminated, asked to resign from any job, or received discipline on any job complete the following information for each:

   Employer: Wilmer PD                    Phone: 972-441-6865

   Address: 219 E Belt line Rd  Wilmer, Tx 75172

   Date of Employment: November 27, 2017          thru: December 03, 2019

   Reason for Dismissal or Disciplinary Action: Use of Force

Do any of the following circumstances apply to your police service? (Check all that apply)

☐ Yes  ☒ No   Accepted money or a material for not enforcing the law

☐ Yes  ☒ No   Committed any crime while employed as a police officer

☐ Yes  ☐ No   Received discipline while employed as a police officer

☒ Yes  ☐ No   Received written reprimands while employed as a police officer

☒ Yes  ☐ No   Suspended while employed as a police officer

☒ Yes  ☐ No   Terminated from employment as a police officer

☐ Yes  ☒ No   Slept while on duty

☐ Yes  ☐ No   Resigned while under investigation

☐ Yes  ☒ No   Had any type of unauthorized physical or sexual contact while on duty

☐ Yes  ☒ No   Consumed any type of alcoholic beverage while on duty

☐ Yes  ☒ No   Used marijuana, illegal drugs, or narcotics while employed as a police officer

☐ Yes  ☒ No   Committed any undetected act while a police officer which if it were discovered would result in disciplinary action or criminal charges

**Please provide a detailed explanation of all that apply:**

I have been disciplined, reprimanded, suspended and terminated all for to incident that occurred on 11/2019 at Wilmer P.D. I have been reprimanded and disciplined for issues at Rockwall S.O. The issue was corrected!

48.     Chief of Police John Deleon of the Ferris Police Department consciously failed to adequately screen Defendant Vernon prior to hiring Vernon despite awareness of Vernon's prior use of excessive force as an investigation was conducted into all of Vernon's prior places of employment **except** the Wilmer Police Department where he had been previously terminated for excessive use of force.

49.     The images below depict Vernon's prior places of employment as well as a memorandum addressed to Chief Deleon showing a background check was conducted into all of Vernon's prior places of employment **except** the Wilmer Police Department.



AN EQUAL OPPORTUNITY EMPLOYER

City of Ferris
100 Town Plaza
Ferris, TX 75125

972-544-2110
972-842-5761

## *City of Ferris*
### EMPLOYMENT APPLICATION

Name: **Vernon Jr**     **Kevin**     **Joseph**     Date: **12/09/219**
LAST NAME          FIRST NAME     MIDDLE

Address: MAILING ADDRESS     **Red Oak**     **TX**     **75154**
                CITY        STATE    ZIP CODE

Phone:          Cell Phone:

Title of job you are applying for: **Police Officer**     /Full time ☐ Part time ☐

### THIS APPLICATION WILL BE USED FOR <u>ONE POSITION</u> ONLY.

If you wish to apply for other positions with the City of Ferris, you must submit an individual application for each position. Failure to complete this application in full may lead to disqualification.

May we contact your present employer? Yes ☑ No ☐ N/A ☐ Former employer (s) may be contacted.

**EMPLOYMENT HISTORY: LIST ALL EMPLOYMENT FOR AT LEAST THE PAST 10 YEARS.** List present or most recent position first. If you need more space, please continue on a separate page. Provide sufficient qualifying experience data. **Resumes will not be accepted in place of the information requested below.**

Employer: **Wilmer Police Department**

Employer Address: **219 E Beltline Rd, Wilmer, TX 75172**     Supervisor: **Chief Victor Kemp**

From: **11/27/2019**  To: **12/03/2019**  Job Title: **Police Officer**     Salary: **50,000**

Description of Job Duties: **Police Officer Duties**

Reason for Leaving/Wanting to Leave: **General Termination**     Phone Number: **972-441-6565**

Employer: **Quinlan Police Department**

Employer Address: **104 E Main St, Quinlan, TX 75474**     Supervisor: **Chief Johnny Thornburg**

From: **09/02/2017**  To: **11/26/2017**  Job Title: **Reserve/Part Time Police Officer**     Salary: **10.00**

Description of Job Duties: **Police Officer Duties**

Reason for Leaving/Wanting to Leave: **Full Time Police Position**     Phone Number: **903-356-2500**

**EMPLOYMENT HISTORY: (Continued)**

Employer: Rockwall County Sheriff's Office          Supervisor: Deborah Townsend

Employer Address: 950 T.L. Townsend Dr, Rockwall, TX 75087

From: 05/2015    To: 02/14/2017    Job Title: Detention Officer          Salary: 35,690

Description of Job Duties: Detention Officer Duties

Reason for Leaving/Wanting to Leave: Attended Police Academy    Phone Number: 972-204-7001

PLEASE EXPLAIN ALL PERIODS OF UNEMPLOYMENT EXCEEDING 90 DAYS: Attenede Police Academy
between 03/2017-09/2017



Ferris Police Department * 111 Ewing Blvd. * Ferris, TX 75125 * 972-842-2092 * Fax 972-544-3625

12/10/2019

**MEMORANDUM**

From: Det. Matt Mosley

To: Chief John Deleon

Subject: APPLICANT – KEVIN VERNON

I have reviewed Kevin Vernon's background packet and my findings indicate that he would be an asset to our department and I fully recommend moving forward with the hiring process.

I first was able to converse with his father, with whom he has a great relationship and remains in regular contact.  Mr. Vernon Sr. indicated that he's always been even tempered and respectful

I left a voicemail with Sgt. Mohr at Quinlan Police but was able to speak with an officer who served with Kevin, one Daniel Catalan.  Officer Catalan called him "a hard worker...a go-getter", he indicated that Kevin demonstrated a great attitude with other officers as well as citizens and offenders that he encountered during his service.  Officer Catalan specifically pointed out that Kevin knew when to turn up aggression and reduce aggression appropriately.

I was unable to contact his supervisor at Rockwall County Jail, but I was able to contact a co-worker from RCSO jail.  Terry Hagin worked closely with Kevin and commented first on how likeable he was and how hard of a worker he was.  Mr. Hagin stated that Kevin handles himself well in difficult or intense situations.  Kevin indicated that there was one minor disciplinary action from his time at Rockwall County and that it was circumstantial and resulted from a supervisor who was dishonest and with whom it was difficult to get along.

In the essay portion of his PHS, he states that he works hard and follow instructions, will do his best at all times and the most important statement being that he will be constantly looking for ways to improve.  I believe this to mean that he is teachable which is tremendously important to consider in our selection process.

**<u>Excessive Use of Force Against Ms. Sindelir</u>**

50.    The incident involving female detainee Plaintiff Sindelir was shockingly similar to Defendant Vernon's prior uses of excessive force against other female detainees.

51.    On July 19, 2020, Plaintiff Brandon Sindelir and her friend Tiffany Rios arrived at Ms. Sindelir's residence after a visit to a water park.

52.    Ms. Sindelir wore a bathing suit and Ms. Rios wore a sports bra and shorts.

53.    Below is a screenshot showing Ms. Sindelir's attire.



54.     After Ms. Sindelir's dog ran out her residence, Ms. Rios went outside to retrieve it.

55.     Defendant Vernon sat inside his patrol vehicle in Ms. Sindelir's neighborhood.

56.     Defendant Vernon approached Ms. Rios and demanded that she go back inside because she was being "indecent" based on her attire.

57.     Ms. Rios explained she was outside to retrieve Ms. Sindelir's dogs and she had just come back from the waterpark.

58.     Defendant Vernon detained Ms. Rios for being "indecent" placed her in handcuffs in the back of his patrol vehicle and told her she was being arrested for indecent exposure.

59.     Defendant Vernon then changed his stance from arresting Ms. Rios to giving her a citation for indecent exposure.[1]

60.     Officer Johnathan Purifoy responded to Defendant Vernon's call for assistance.

61.     Ms. Sindelir's daughter witnessed the entire encounter involving Ms. Rios.

62.     Ms. Sindelir's daughter went inside Ms. Sindelir's residence to inform her about Ms. Rios' detention.

63.     Ms. Sindelir went outside and inquired why Ms. Rios was detained.

64.     Ms. Sindelir asked Defendant Vernon if she could give Ms. Rios a towel.

65.     Defendant Vernon instructed Ms. Sindelir to step back because she was "interfering."

66.     Ms. Sindelir was not "interfering" as she remained on her property approximately ten to twelve feet away while she spoke with Defendant Vernon.

67.     Ms. Sindelir was not "interfering" as Ms. Rios had already been detained inside Defendant Vernon's patrol vehicle.

68.    Ms. Sindelir began to record her conversation with Defendant Vernon.

69.    As Ms. Sindelir began to record, Defendant Vernon approached Ms. Sindelir, ripped her phone out her hand, and slammed her onto the gravel driveway.

70.    Ms. Sindelir's neighbor began to record the incident.[2]

71.    Defendant Vernon twisted Ms. Sindelir's arm as he began to cuff her on the gravel driveway.

72.    The image below is a still shot from the cell phone recording taken by Ms. Sindelir's neighbor which shows Defendant Vernon twisting Ms. Sindelir's arm while Ms. Sindelir lay defenseless on the gravel driveway.



---

[1] Ms. Rios alleged that Defendant Vernon handcuffed and detained her based on indecent exposure and that she was dressed appropriately and should have never been detained. Ms. Rio's allegations against Defendant Vernon were later sustained in an internal affairs investigation.
[2] The recording is attached as Exhibit A and incorporated fully herein.

73.     While holding Ms. Sindelir defenseless down on the gravel driveway, Defendant Vernon again asserted that Ms. Sindelir was "interfering with [his] investigation."

74.     Ms. Sindelir was not "interfering" as she had remained on her property approximately ten to twelve feet away while speaking with Defendant Vernon and it was Defendant Vernon who approached her.

75.     Ms. Sindelir as not "interfering" as Ms. Rios had already been detained inside Defendant Vernon's patrol vehicle.

76.     Ms. Sindelir was then picked up from the ground and detained in the back of a patrol vehicle.

77.     After a phone call with Sergeant Peter Santi, Defendant Vernon was instructed to release Ms. Sindelir and Ms. Rios.

78.     During this phone call, Officer Purifoy informed Sergeant Santi that he "**did not feel like Defendant Vernon was justified in his actions.**"

79.     Ms. Rios was released without being formally charged or receiving a ticket.

80.     Ms. Sindelir was released without being formally charged or receiving a ticket.

81.     Defendant Vernon did not have reasonable suspicion to support detaining Ms. Sindelir for the offense of Interfering with Public Duties as Defendant Vernon was aware that Ms. Sindelir did not commit the offense of Interfering with Public Duties.

82.     As a result of Defendant Vernon's use of force, Ms. Sindelir suffered bruises, swelling on her body, and a rash on her shoulder.

83.     Below are pictures of Ms. Sindelir's injuries.






84.    On July 20, 2020, a day after Defendant Vernon's excessive use of force, Ms. Sindelir received treatment from Baylor Scott & White.

85.    Ms. Sindelir was diagnosed with the following injuries:

**Final Diagnoses (ICD-10-CM)**

| Code | Description | POA | CC | HAC | Affects DRG |
|------|-------------|-----|----|-----|-------------|
| S40.022A [Principal] | Contusion of left upper arm, initial encounter | | | | |
| S40.211A | Abrasion of right shoulder, initial encounter | | | | |
| S80.211A | Abrasion, right knee, initial encounter | | | | |
| M25.532 | Pain in left wrist | | | | |
| M25.531 | Pain in right wrist | | | | |
| M79.89 | Other specified soft tissue disorders | | | | |
| R00.0 | Tachycardia, unspecified | | | | |

**External Causes of Injury (ICD-10-CM)**

| Code | Description | POA | CC | HAC | Affects DRG |
|------|-------------|-----|----|-----|-------------|
| Y04.2XXA | Assault by strike against or bumped into by another person, initial encounter | | | | |
| Y92.009 | Unspecified place in unspecified non-institutional (private) residence as the place of occurrence of the external cause | | | | |

86.    Below are more photos taken of Ms. Sindelir's injuries.




87.    After the incident, Ms. Sindelir filed a complaint with Chief of Police John DeLeon and City Manager Brooks Williams.

88.    The next day City Manager Williams went to Ms. Sindelir's residence to apologize for the actions of Defendant Vernon.

89.    After an internal affairs investigation Defendant Vernon was placed on Administrative Leave.

90.    On July 22, 2020, Defendant Vernon was terminated from the Ferris Police Department after an internal affairs investigation.

91.    The written report from the internal affairs investigation further corroborates Ms. Sindelir's allegations against Defendant Vernon.

92.    Ms. Sindelir specifically alleged that Defendant Version used excessive force which was unprovoked to execute a takedown subsequently handcuffing her and detaining her.

93.    The written report states the following: "Officer Purifoy's in dash cam video and body worn microphone were reviewed. The video shows Officer Vernon's squad car (Unit 2017) parked on the west bound lane of W. 1st street facing east bound and Officer Vernon standing by the passenger rear door while the door is open. Officer Vernon is speaking with Rios who has been detained and is sitting in the rear seat. Sindelir is seen coming into camera while remaining on her property with her mobile phone on her hand and stand[ing] approximately 10 to 12 feet away from where Officer Vernon is standing."

94.    "Based on the statements and video presented, Sindelir's allegations are sustained. There had been no crime committed to elicit police intervention from the point Officer Vernon arrived till the point where Officer Vernon left. If there was cause for the police to intervene with Sindelir, it was perpetrated solely by Officer Vernon's actions and not by actions of Sindelir. Furthermore, Sindelir never "ran up" on Officer Vernon as Officer Vernon claims. Sindelir never approached Officer Vernon and while Sindelir was on scene was never disruptive to the point that required Officer Vernon to turn his full attention to Sindelir and address the behavior. Officer Vernon stated that Sindelir was interfering with public duties a violation of Penal Code 38.15. The actions by Sindelir do not meet the elements of the crime for interfering with public duties."

95.    Furthermore, this action caused Officer Vernon to escalate the situation by laying hands on Sindelir and attempting to execute a takedown thus using unnecessary force to subdue her. Sindelir was then handcuffed and placed in the back of Officer Purifoy's car where it **violated Sindelir's civil rights**.

96.    Sergeant Peter Santi reported the following during the internal affairs investigation: "I then asked if [Defendant Vernon] he had slammed anyone on the ground and he said no [Ms. Sindelir] just fell. I then spoke to Officer Purifoy about what happened, and he said that Officer Vernon did slam a white female on the ground on a gravel driveway. I then asked Officer Purifoy if he thought it was justified in slamming the female to the ground and he said no. I then instructed Officer Vernon to head back to the Ferris Police Department and not to patrol anymore for the night. I also instructed Officer Vernon to only head out if Officer Purifoy required back up."

97.    Additionally, the internal affairs investigation shows that Defendant Vernon attempted to cover up his actions.

98.    "Officer Vernon was then asked about Brandon Sindelir 'running up on him.' Officer Vernon claimed that Sindelir walked up to him, and he was unaware of her intentions. Video from Officer Purifoy's in dash camera **refute** Officer Vernon's statement. Sindelir never got close to Officer Vernon."

99.    "Officer Vernon further adds that Sindelir repeatedly disregarded his commands to back away. Video from Officer Purifoy's dash camera shows Sindelir approximately 10 to 12 feet away from Officer Vernon and never making any threatening moves other than hold the phone on her hand. In fact, the video shows Officer Vernon approach Sindelir to within approximately 6 inches away from her face…"

100.    "Officer Vernon was then asked about the conversation with [Sergeant] Santi and [Sergeant] Santi asking him if he had taken down Sindelir. Officer Vernon's response was that he and Sindelir had to wrestle because Sindelir kept on running up on him further adding that Sindelir fell to the ground as opposed to him slamming her on the ground."

101.    "Video provided by Officer Purifoy **refutes** that Sindelir fell to the ground as Officer Vernon states. Sindelir, if not for the fact that Officer Vernon attempted to detain her would not have fallen to the ground causing several scrapes to her knee, back, and shoulder areas. Along with bruising of Sindelir's arms."

102.    This means that Defendant Vernon plainly fabricated justification for detaining and using excessive force against Ms. Sindelir, a female detainee, just as he did so during his interactions with female detainees while employed as an officer with the Wilmer Police Department.

103.    At all times relevant to this suit, Defendant Vernon was acting under the color of law as he was an on-duty police officer for the city of Ferris Police Department at the time he used excessive force by slamming Ms. Sindelir to the ground and twisting her arm behind her back and at the time he illegally detained Ms. Sindelir.

## IV.
## CAUSES OF ACTION

### Count One

### Excessive Force
### Violation of the Fourth Amendment Pursuant to 42 U.S.C. § 1983
### Against Defendant Vernon

104.    Ms. Sindelir repeats and re-alleges each and every allegation contained in the above paragraphs as if fully repeated herein.

105.    Acting under the color of law, Defendant Vernon deprived Ms. Sindelir of the rights and privileges secured to her by the Fourth and Fourteenth Amendments to the United States Constitution and by other laws of the United States to be free from illegal and unreasonable seizures by the use of force.

106.    Ms. Sindelir brings this cause of action pursuant to 42 U.S.C. § 1983.

107.    The amount of force used by Defendant Vernon against Ms. Sindelir as described above, specifically but not limited to, when Defendant Vernon twisted Ms. Sindelir's arms behind her back and slammed her on the ground was objectively unreasonable under the circumstances and inflicted unnecessary injury, pain, and suffering upon Ms. Sindelir.

108.    A seizure is unreasonable if it results in (a) an injury, (b) that resulted directly and only from a use of force that was clearly excessive, and (c) the excessiveness was clearly unreasonable.

109.    Where an individual's conduct amounts to mere "passive resistance," use of force is not justified. *Trammell v. Fruge*, 868 F.3d 332, 341 (5th Cir. 2017) (finding that the plaintiff pulling his arm away from officers amounted to only passive resistance and did not justify the use of force against plaintiff); *Hanks v. Rogers*, 853 F.3d 738, 746 (5th Cir. 2017) (determining the plaintiff's initial refusals to follow a police officer's instructions amounted to, "at most, passive resistance" and did not justify the officers use of a " 'half spear' takedown" against the plaintiff); *Goodson v. City of Corpus Christi*, 202 F.3d 730, 740 (5th Cir. 2000) (plaintiff pulling arm away from an officer after the officer grabbed the plaintiff's arm was only minimal resistance, if at all, and did not justify two officers tackling the plaintiff).

110.    At most Ms. Sindelir's initial failure to put her hands behind her back amounted to passive resistance, thus twisting her arm behind her back and slamming her on the ground was objectively unreasonable and a use of excessive force in violation of her constitutional rights under the Fourth Amendment.

111.    Ms. Sindelir was not threatening any officer or other person immediately prior to and when Defendant Vernon twisted her arms behind her back and slammed her on the ground as Ms. Sindelir was approximately ten to twelve feet away and not making any verbal threats or physical threats.

112.    A reasonable officer would know that the use of force is <u>clearly excessive</u> when engaging with citizens such as Ms. Sindelir who was not threatening any officer or other person, was not suspected of committing any crime, was not attempting to flee, was at most passively resisting arrest, and who the use of force was not warranted.

113.    A reasonable officer would know that the use of force is <u>clearly unreasonable</u> when engaging with citizens such as Ms. Sindelir, who was not threatening any officer or other person,

was not suspected of committing any crime, was not attempting to flee, was at most passively resisting arrest, and who the use of force was not warranted.

114.    A reasonable officer in Defendant Vernon's position would know that twisting an individual's arm behind their back and slamming them on the ground when that person was not threatening any officer or other person, was not suspected of committing any crime, was not attempting to flee, and was a most passively resisting arrest is clearly unreasonable and excessive.

115.    Ms. Sindelir had not even committed a crime, and there was not probable cause to suspect her of committing any crime.

**Ms. Sindelir did not commit the offense of Interference with Public Duties.**

116.    Ms. Sindelir was not suspected of committing a felony offense immediately prior to and at the time when Defendant Vernon slammed her agaisnt the ground and twisted her arm.

117.    In Texas, a person commits the offense of interference with public duties if the person "with criminal negligence interrupts, disrupts, impedes or otherwise interferes with: (1) a peace officer while the peace officer is performing a duty or exercising authority imposed or granted by law." TEX. PENAL CODE § 38.15(a)(1).

118.    It is a defense to prosecution of this offense if: "the interruption, disruption, impediment, or interference alleged consisted of speech only." TEX. PENAL CODE § 38.15(d).

119.    Texas courts have recognized that merely arguing with police officers about the propriety of their conduct, falls within the speech exception to Section 38.15. *Freeman v. Gore*, 483 F.3d 404, 414 (5th Cir.2007).

120.    During the incident Ms. Sindelir's conduct did not stray from the realm of speech as Ms. Sindelir simply asked Defendant Vernon why her friend Ms. Rios was detained.

121.     During the incident, Ms. Sindelir did not physically interfere with the Defendant's commands as she complied with Defendant's order to remain some distance away—approximately ten to twelve feet while remaining on her residence.

122.     Thus, it was clearly established on the date of this incident that Defendant Vernon could not arrest nor detain Ms. Sindelir for questioning the reason for her friend Ms. Rio's detention as these actions did not constitute the offense of Interference with Public Duties.  TEX. PENAL CODE § 38.15(d); *Freeman*, 483 F.3d at 414.

123.     Thus, Ms. Sindelir did not commit any offense justifying the use of force as she did not commit the offense of Interference with Public Duties nor any other offense at the time Defendant Vernon twisted her arm behind her back and slammed her on the ground.

124.     As a direct result of the force used against her by Defendant Vernon Ms. Sindelir suffered physical injuries, pain, and mental anguish for which she sues herein.

125.     These injuries were not caused by any other means.

126.     When Defendant Vernon used excessive force agaisnt Ms. Sindelir, Defendant Vernon was acting under the color of law, as he was in full police uniform, and then handcuffed and detained Ms. Sindelir.

### Count Two

### Illegal Detention
### Violation of the Fourth Amendment Pursuant to 42 U.S.C. § 1983
### Against Defendant Vernon

127.     Plaintiff repeats and re-alleges each and every allegation contained in the above paragraphs as if fully incorporated herein.

128.     No right is held more sacred, or is more carefully guarded by the common law, than the right of every individual to the possession and control of his own person, free from all restraint

or interference of others, unless by clear and unquestionable authority of law. *Terry v. Ohio*, 392 U.S. at 9.

129.   Defendant Vernon deprived Ms. Sindelir of her constitutionally protected right to be free from unreasonable seizures under the Fourth Amendment by unlawfully detaining her despite lacking reasonable suspicion that any crime had been committed as Ms. Sindelir had not committed the offense of interference with public duties, nor any other offense justifying her detention.

130.   To prevail on a claim for unlawful seizure a plaintiff must allege facts that if true show that the defendant police officer lacked reasonable suspicion to detain or probable cause to arrest the Plaintiff. *Connors v. Graves*, 538 F.3d 373, 377 (5th Cir. 2008) (discussing showing of no probable cause with respect to claim for unlawful seizure); *Haggerty*, 391 F.3d at 655.

131.   Unlawful detention implicates the Fourth Amendment's proscription against unreasonable seizures. *Peterson v. City of Fort Worth, Tex.*, 588 F.3d 838, 845 (5th Cir. 2009) *See Terry*, 392 U.S. at 16 ("[W]henever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person.").

132.   Under *Terry*, an officer may temporarily detain a person for investigative purposes if the officer has a reasonable suspicion <u>supported by articulable facts</u> that criminal activity may be afoot. *United States v. Sokolow*, 490 U.S. 1, 7, 104 L. Ed. 2d 1, 109 S. Ct. 1581 (1989); *United States v. Jones*, 234 F.3d 234, 241 (5th Cir. 2000).

133.   The suspicion required to justify such a detention need not rise to the level of probable cause <u>but must be based on more than an unparticularized suspicion or hunch</u>. *Jones*, 234 F.3d at 241.

134.    In determining whether reasonable suspicion existed to justify the defendant's continued detention, the Court must look at the totality of the circumstances. *Id*.

135.    Here, Defendant Vernon did not have reasonable suspicion that Ms. Sindelir had committed, was committing, or was about to commit any crime when Defendant detained Ms. Sindelir.

136.    Defendant Vernon could point to no articulable facts supporting reasonable suspicion, as no crime had been committed by Ms. Sindelir.

### Ms. Sindelir did not commit the offense of Interference with Public Duties

137.    Ms. Sindelir was not suspected of committing a felony offense immediately prior to and at the time when Defendant Vernon slammed her agaisnt the ground and twisted her arm.

138.    In Texas, a person commits the offense of interference with public duties if the person "with criminal negligence interrupts, disrupts, impedes or otherwise interferes with: (1) a peace officer while the peace officer is performing a duty or exercising authority imposed or granted by law." TEX. PENAL CODE § 38.15(a)(1).

139.    It is a defense to prosecution of this offense if: "the interruption, disruption, impediment, or interference alleged consisted of speech only." TEX. PENAL CODE § 38.15(d).

140.    Texas courts have recognized that merely arguing with police officers about the propriety of their conduct, falls within the speech exception to Section 38.15. *Freeman,* 483 F.3d at 414.

141.    During the incident Ms. Sindelir's conduct did not stray from the realm of speech as Plaintiff simply asked Defendant Vernon why her friend Ms. Rio's was being detained.

142.    During the incident, Ms. Sindelir did not physically interfere with the Defendant's commands as Plaintiff complied with Defendant's order to remain some distance away—approximately ten to twelve feet away on her residence.

143.    Thus, it was clearly established on the date of this incident that Defendant Vernon could not arrest nor detain Ms. Sindelir for questioning the reason for her friend's detention as these actions did not constitute the offense of Interference with Public Duties.  TEX. PENAL CODE § 38.15(d); *Freeman*, 483 F.3d at 414.

144.    Accordingly, Defendant Vernon violated Ms. Sindelir's Fourth Amendment rights to be free from illegal seizure when he detained Ms. Sindelir without reasonable suspicion nor probable cause that Ms. Sindelir had committed, was committing, or was about to commit a crime.

145.    As a result of the illegal detention, Ms. Sindelir suffered injuries.

146.    As a result of the illegal detention, Defendant Vernon deprived Ms. Sindelir of her civil, constitutional, and statutory rights and is liable to Ms. Sindelir pursuant to 42 U.S.C. § 1983.

147.    Ms. Sindelir was damaged as a result of wrongful acts as her liberty was deprived and she suffered emotional distress and mental anguish.

148.    When Defendant Vernon illegally detained Ms. Sindelir, Defendant Vernon was acting under color of law, as he was in full police uniform, handcuffed, and placed Ms. Sindelir in the back of a patrol vehicle.

**Count Three**

**Municipal Liability**
**Monell v. New York City Department of Social Services**
**Violation of the Fourth Amendment Pursuant to 42 U.S.C. § 1983**

149.    Plaintiff repeats and realleges each and every allegation contained in the above paragraphs as if fully repeated herein.

150.    A municipality may be held liable under § 1983 for a constitutional violation that resulted from (1) an official municipal policy, (2) an unofficial custom, or (3) a deliberately indifferent failure to train. *Monell v. Dep't of Social Servs. of City of New York*, 436 U.S. 658, 690-91 (1978); *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)).

151.    To establish municipal liability, a plaintiff must (1) "identify conduct properly attributable to the municipality" and (2) "demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged." *Bd. of the Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown*, 520 U.S. 397, 403, 117 S. Ct. 1382, 137 L. Ed. 2d 626 (1997).

152.    Thus, "a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Id.*

153.    In *Board of the County Commissioners of Bryan County v. Brown*, 520 U.S. 397, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997), the Supreme Court established the standard of liability for hiring decisions: "Only where adequate scrutiny of an applicant's background would lead a reasonable policymaker to conclude that the plainly obvious consequence of the decision to hire the applicant would be the deprivation of a third party's federally protected right can the official's failure to adequately scrutinize the applicant's background constitute 'deliberate indifference.' " *Id.* at 411.

154.    The Supreme Court explained that for liability to exist, there must be "a finding that *this* officer was highly likely to inflict the *particular* injury suffered by the plaintiff." *Id.* at 412. (emphasis in original).

155.    Defendant Deleon is responsible for hiring, retention, and training practices in the Ferris Police Department.

156.    Defendant Deleon did not adequately scrutinize Defendant Vernon's background. *Brown*, 520 U.S. at 411.

157.    Had Chief Deleon adequately scrutinized Defendant Vernon's background it would have prevented Vernon from causing constitutional harm namely the excessive use of force towards female detainees like Ms. Sindelir while Vernon was employed as an officer with the Ferris Police Department.

158.    Specifically, it was highly likely Defendant Vernon was to inflict the particular injury suffered by Ms. Sindelir since while employed as an officer with the Wilmer Police Department Vernon committed three excessive use of force incidents involving female detainees. *Brown*, 520 U.S. at 412.

159.    On September 19, 2019, during a traffic stop, Defendant Vernon abruptly and aggressively grabbed a female detainee and pushed her against the rear of his vehicle.

160.    Once in handcuffs Defendant Vernon grabbed the female detainee by her arm and jerked her in the direction of his patrol vehicle although the female detainee was not resisting

161.    On October 26, 2019, during a traffic stop, Defendant Vernon forcibly slammed the door on a female detainee's foot even though the female detainee was not posing a threat to officer safety.

162.    Defendant Vernon never used any de-escalation techniques to get the female detainee to comply.

163.    On November 12, 2019, although a female detainee was cooperative and complied with Defendant Vernon's instructions and answered his questions, Defendant Vernon grabbed her by the hands, slammed her up against his patrol vehicle and threw her into the backseat.

164.    Defendant Vernon was terminated from the Wilmer Police Department on December 3, 2019, as result of the November 12, 2019 use of force incident.

165.    Below is a screenshot of a letter from Chief Victor Kemp of the Wilmer Police Department to Defendant Vernon addressing the internal affairs investigation into the November 12, 2019 incident. Chief Kemp alleges after careful review of the information available that Officer Vernon violated Wilmer Police Policy 6.1 Use of Force.

Chief Kemp alleges that at no time did Officer Vernon use any de-escalation techniques and that all of Officer's Vernon's verbal instructions and commands seemed to come from an agitated and/or emotionally elevated level.

Chief Kemp alleges after careful review of the information available that Officer Vernon violated **Wilmer Police Policy 6.1 Use of Force** in that the totality of the circumstances in question, the seriousness of the alleged crime, the threat that the suspect posed, was unreasonable in that it does not appear the suspect was resisting any lawful order, only asking questions of the officer. Chief Kemp alleges that there were no Exigent Circumstances that would cause a reasonable person to believe the forced used by Officer Vernon was necessary and that Officer Vernon used no action or communication either verbally or non-verbally to de-escalate the situation. Chief Kemp alleges that it appears time was on Officer's Vernon side to attempt to effectively communicate with Vera but chose instead to quickly resort to hands on use of force.

166.    Below is a screenshot of the investigative findings concerning the internal affairs investigation into the November 12, 2019 incident. There was sufficient evidence to conclude Defendant Vernon's conduct and actions sustained the following allegations: (1) violation of law enforcement code of ethics, (2) failure to consistently maintain satisfactory performance standards, (3) discourteous and irresponsible treatment of the public, (4) incompetent and inefficient performance and dereliction of duty, (5) conduct unbecoming of an officer, and (6) unnecessary and unreasonable use of force.

**FINDINGS**

There is sufficient evidence to conclude that Officer Vernon's conduct and actions **sustain** the following allegations:

Allegation #1  Violation of Law Enforcement Code of Ethics **(SUSTAINED)**

Allegation #2  Failing to consistently maintain satisfactory performance standards. **(SUSTAINED)**

Allegation #3  Discourteous and irresponsible treatment of the public. **(SUSTAINED)**

Allegation #4  Incompetent and inefficient performance and dereliction of duty. **(SUSTAINED)**

Allegation #5  Conduct unbecoming of an officer **(SUSTAINED)**

Allegation #6  Unnecessary and unreasonable use of force **(SUSTAINED)**

167.    Shockingly, in Defendant Vernon written report about the November 12, 2019 traffic stop Vernon stated: "I should have taken further de-escalation measures, other than just removing [the female detainee] away from the audience. *I learned that I need to take more time to evaluate the situation before responding too quickly to certain situations.*"

168.    Chief Deleon in his official capacity as final policymaker for the Ferris Police Department, acted with deliberate indifference to the known or plainly obvious consequences that hiring Defendant Vernon would cause and thus is liable for Vernon's subsequent constitutional violations while acting as a City of Ferris police officer. *Brown*, 520 U.S. at 407.

169.    Deleon acted with deliberate indifference to the known or plainly obvious consequences that hiring Defendant Vernon would cause as a background check was conducted on all of Vernon's former places of employment except the most recent place of employment where he listed on his application to work for Ferris that he had been terminated for committing excessive use of force---the Wilmer Police Department.

## SECTION 5: EMPLOYMENT HISTORY
### 5.1: EMPLOYMENT INFORMATION

> **INSTRUCTIONS:** Beginning with your present or most recent job, list all employment since the age of 15. Include all part-time, temporary, or seasonal employment regardless of how long you actually worked. List all reserve duty, volunteer work, and internships. Include all periods of unemployment, stating what you were doing and your means of support during this time.

**May we contact your current employer?**   ☑ Yes   ☐ No

Name of Employer: _Wilmer Police Department_   Begin Date: _11/23/2017_ End Date: _12/03/2019_
(mm/yyyy)   (mm/yyyy)

_219 E. Beltline Rd_ _____ _Wilmer_ _ _TX_ _75122_ _972-441-6565_
Address                          City         State    ZIP    Phone #

Name of Supervisor: _Chief Victor Kemp_   Salary: _$50,000 00 yr_
PD: _972-441-6565_

Name of Coworker: _Sergeant William Jackson_   Phone #: _469-216-0584_

Job Title, Years held in Position: _Police Officer, 2 years_

Description of duties: _Patrol Foot/Vehicle, Answering emergency & non-emergency calls,_
_respond to alarms, conduct traffic stops and enforce state, federal and local laws_

Type of Employment:   ☑ Full Time   ☐ Part Time   ☐ Temporary   ☐ Seasonal

Reason for Separation:   ☐ Resigned, w/ notice   ☐ Quit, w/o notice   ☑ Termination
☐ Laid Off   ☐ Temporary, end of term

How much notice was given? _N/A_

Was the amount given in accordance with company policy?   ☐ Yes   ☐ No

Have you received any disciplinary action from this employer?   ☑ Yes   ☐ No
(counseling, memo, verbal or written reprimands, etc.)

If Yes, list date, type of discipline, and explain the circumstances: _12/3/19 was terminated for_
_a "Use of force" incident that occurred on 11-12-2019._





Ferris Police Department * 111 Ewing Blvd. * Ferris, TX 75125 * 972-842-2092 * Fax 972-544-3625

12/10/2019

**MEMORANDUM**

From: Det. Matt Mosley

To: Chief John Deleon

Subject: APPLICANT – KEVIN VERNON

I have reviewed Kevin Vernon's background packet and my findings indicate that he would be an asset to our department and I fully recommend moving forward with the hiring process.

I first was able to converse with his father, with whom he has a great relationship and remains in regular contact. Mr. Vernon Sr. indicated that he's always been even tempered and respectful

I left a voicemail with Sgt. Mohr at Quinlan Police but was able to speak with an officer who served with Kevin, one Daniel Catalan. Officer Catalan called him "a hard worker...a go-getter", he indicated that Kevin demonstrated a great attitude with other officers as well as citizens and offenders that he encountered during his service. Officer Catalan specifically pointed out that Kevin knew when to turn up aggression and reduce aggression appropriately.

I was unable to contact his supervisor at Rockwall County Jail, but I was able to contact a co-worker from RCSO jail. Terry Hagin worked closely with Kevin and commented first on how likeable he was and how hard of a worker he was. Mr. Hagin stated that Kevin handles himself well in difficult or intense situations. Kevin indicated that there was one minor disciplinary action from his time at Rockwall County and that it was circumstantial and resulted from a supervisor who was dishonest and with whom it was difficult to get along.

In the essay portion of his PHS, he states that he works hard and follow instructions, will do his best at all times and the most important statement being that he will be constantly looking for ways to improve. I believe this to mean that he is teachable which is tremendously important to consider in our selection process.

170.   Liability exists in this case as Defendant Vernon was highly likely to inflict the particular injury suffered by Ms. Sindelir, namely, unnecessary and unreasonable use of force, failure to resort to de-escalation measures, and plain fabrication of facts during encounters with female detainees/arrestees. *Brown*, 520 U.S. at 411-12.

171.   Defendant Deleon's decision not to follow up with the Wilmer Police Department regarding the excessive use of force which was the reason for Defendant Vernon's termination from

that department and which was listed multiple times on his application for employment with Ferris Police Department reflected a conscious disregard for a high risk that Defendant Vernon would use excessive force in violation of Plaintiff's federally protected rights. *Brown*, 520 U.S. at 415–16.

172.    These injuries were not caused by any other means.

### V.
### PUNITIVE DAMAGES

173.    Ms. Sindelir repeats and re-alleges each and every allegation contained in the above paragraphs as if fully repeated herein.

174.    When viewed objectively from the standpoint of Defendant Vernon, and, at the time of the occurrence, said Defendant's conduct involved an extreme degree of risk, considering the probability and magnitude of potential harm to others.

175.    As a direct, proximate, and producing cause and the intentional, egregious, malicious conduct by Defendant Vernon which was recklessly or callously indifferent to Ms. Sindelir's protected rights, Ms. Sindelir is entitled to recover punitive damages in an amount within the jurisdictional limits of this Court.

### VI.
### DAMAGES

176.    Ms. Sindelir repeats and re-alleges each and every allegation contained in the above paragraphs as if fully repeated herein.

177.    Ms. Sindelir's injuries were a foreseeable event. Those injuries were directly and proximately caused by Defendant Vernon's illegal detention and use of excessive and unreasonable force against Ms. Sindelir and Defendant Deleon's deliberate indifference in hiring Defendant Vernon as an officer with the Ferris Police Department despite Defendant Vernon's historical

pattern of using excessive force against female detainees such as Ms. Sindelir in this case. As a result, Ms. Sindelir is entitled to recover all actual damages allowed by law.

178.    Ms. Sindelir contends the Defendant's conduct constitutes malice, evil intent or reckless or callous indifference to Ms. Sindelir's constitutionally protected rights. Thus, Ms. Sindelir is entitled to punitive damages.

179.    As a direct and proximate result of the occurrence which made the basis of this lawsuit, Ms. Sindelir was forced to suffer:

     a.    Physical pain and suffering;

     b.    Emotional distress, torment, and mental anguish; and

     c.    Deprivations of her liberty.

180.    Pursuant to 42 U.S.C. § 1983 and § 1988, Plaintiff seeks to recover, and hereby requests the award of punitive damages, reasonable attorney's fees, and costs of court.

## VII.
## ATTORNEY'S FEES

181.    If Plaintiff prevails in this action, by settlement or otherwise, Plaintiff is entitled to and hereby demands attorney's fees under 42 U.S.C. § 1988.

## VIII.
## JURY REQUEST

182.    Plaintiff respectfully requests a jury trial.

## **PRAYER**

WHEREFORE, PREMISES CONSIDERED, Plaintiff prays that judgment be rendered against Defendants, for an amount in excess of the jurisdictional minimum of this Court. Plaintiff further prays for all other relief, both legal and equitable, to which she may show herself justly entitled.

Respectfully submitted,

*/s/ Scott H. Palmer*
SCOTT H. PALMER,
Texas Bar No. 00797196

*/s/ James P. Roberts*
JAMES P. ROBERTS,
Texas Bar No. 24105721

*/s/ Breanta Boss*
BREANTA BOSS,
Texas Bar No. 24115768

SCOTT H. PALMER, P.C.
15455 Dallas Parkway, Suite 540
Addison, Texas 75001
Telephone: 214.987.4100
Facsimile: 214.922.9900
scott@scottpalmerlaw.com
james@scottpalmerlaw.com
breanta@scottpalmerlaw.com

COUNSEL FOR PLAINTIFFS